UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

KAREN MARIE WILLIS            CIVIL ACTION NO. 6:18-cv-00212

VERSUS                          MAGISTRATE JUDGE HANNA

U.S. COMMISSIONER,          BY CONSENT OF THE PARTIES
SOCIAL SECURITY
ADMINISTRATION

## MEMORANDUM RULING

Before the Court is an appeal of the Commissioner's finding of non-disability. In accordance with the provisions of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the parties consented to have this matter resolved by the undersigned Magistrate Judge (Rec. Doc. 8-1), and the matter was referred to this Court for resolution (Rec. Doc. 9). Considering the administrative record, the briefs of the parties, and the applicable law, the Commissioner's decision is reversed and remanded for further administrative action.

## Administrative Proceedings

The claimant, Karen Marie Willis, fully exhausted her administrative remedies before filing this action in federal court. She filed applications for disability insurance benefits ("DIB") and supplemental security income benefits

("SSI"), alleging disability beginning on August 1, 2012.[1]  Her alleged disability onset date was later changed to June 7, 2014 to coincide with the denial of a previous application for benefits.[2]  After her applications were denied,[3] she requested a hearing, which was held on December 15, 2016 before Administrative Law Judge Robert Grant.[4]  The ALJ issued a decision on January 3, 2107, concluding that the claimant was not disabled within the meaning of the Social Security Act from July 7, 2014 through the date of the decision.[5]  The claimant requested review of that decision, but the Appeals Council concluded that there was no basis for review.[6]  Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g).

The claimant then filed this action seeking review of the Commissioner's decision.

---

[1]      Rec. Doc. 7-1 at 135-136, 142-146.

[2]      Rec. Doc. 7-1 at 46.

[3]      Rec. Doc. 7-1 at 61, 62.

[4]      The transcript is found in the record at Rec. Doc. 7-1 at 38-60.

[5]      Rec. Doc. 7-1 at 24-34.

[6]      Rec. Doc. 7-1 at 4.

## Summary of Pertinent Facts

The claimant was born on July 7, 1969,[7] and was forty-seven years old at the time of the ALJ's decision. She graduated from high school but has no further relevant education, having failed to complete a cosmetology course and online classes through the University of Phoenix.[8] She has relevant work experience as a caregiver or in-home nursing attendant.[9] She alleged that she has been disabled since June 7, 2014[10] due to high blood pressure, allergies, nerve problems, kidney problems, migraine headaches, mental problems, learning disabilities, acid reflux, depression, anxiety, and hot flashes.[11] Although the record contains documentation of physical ailments and medical treatment, the ALJ found that the claimant's only severe impairments were depression and anxiety, and the claimant's briefing solely addressed her mental impairments. Accordingly, the medical evidence related to the claimant's physical impairments will not be summarized or considered in this memorandum ruling.

---

[7]    Rec. Doc. 7-1 at 63.

[8]    Rec. Doc. 7-1 at 44, 49-50.

[9]    Rec. Doc. 7-1 at 183.

[10]    Rec. Doc. 7-1 at 46.

[11]    Rec. Doc. 7-1 at 63, 168.

The claimant stopped working in 2012 after her client, who was also her aunt, passed away. The death of her client allegedly exacerbated the claimant's mental health symptoms and led to an increase in crying spells, isolation, and difficulty controlling her anger. In 2012, the claimant began receiving mental health treatment for depression and anxiety at the Dr. Joseph Henry Tyler Mental Health Center in Lafayette, Louisiana, from psychiatrist George W. Diggs, Jr., M.D. She treated with Dr. Diggs consistently thereafter and also consistently received mental health counseling from social workers at the Tyler Center.

On August 27, 2012, the claimant was evaluated at the Tyler Center.[12] That same day, Dr. Diggs performed a psychiatric evaluation,[13] during which the claimant reported that she felt worthless, depressed, and anxious. She stated that her father abandoned her when she was a child and that she witnessed her mother being abused. She reported hearing voices that others do not hear as well as seeing her deceased grandmother. She reported crying a lot, headaches, overeating, nervousness, and poor concentration. She told Dr. Diggs that she was scared of everyone and wanted to be by herself. Additionally, she reported poor sleep, isolating behavior, panic attacks, and anger. She stated that she saw a psychiatrist when she was five years old. She claimed that her family members do not speak to her. She reported suicidal

---

[12]     Rec. Doc. 7-1 at 281-289.

[13]     Rec. Doc. 7-1 at 290-294.

4

thoughts but stated that she would not harm herself. She stated that she does not drive and depends on her mother for transportation. Dr. Diggs noted that the claimant was depressed and anxious, had persecutory delusions, and auditory and visual hallucinations. He found her insight to be impaired and her judgment to be fair. His clinical summary was that the claimant experienced depression, feelings of worthlessness and hopelessness, anhedonia, lethargy, and isolation. He also noted that she had a history of an abusive family. He diagnosed a major depressive episode with psychosis, panic without agoraphobia, and impulse control disorder. He rated her current GAF score at 48, which indicates serious symptoms,[14] and he replaced the Paxil she had been taking with Sertraline, Buspirone, and Vistaril.

On September 21, 2012, licensed clinical social worker Debra J. Milson prepared a treatment plan for the six-month period from September 21, 2012 to

---

[14]     The Global Assessment of Function ("GAF") scale is used to rate an individual's "overall psychological functioning." American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV") 32 (4th ed. 1994). The scale ascribes a numeric range from "1" ("persistent danger of severely hurting self or others") to "100" ("superior functioning") as a way of categorizing a patient's emotional status. A GAF score in the range of 41 to 50 indicates serious symptoms such as suicidal ideation or any serious impairment in social, occupational, or school functioning. The GAF scale was omitted from DSM–5 because of its "conceptual lack of clarity . . . and questionable psychometrics in routine practice." American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM–5") 16 (5th ed. 2013). However, GAF scores continue to be considered evidence. "We consider a GAF rating as opinion evidence. As with other opinion evidence, the extent to which an adjudicator can rely on the GAF rating as a measure of impairment severity and mental functioning depends on whether the GAF rating is consistent with other evidence, how familiar the rater is with the claimant, and the rater's expertise." *Jackson v. Colvin*, No. 4:14-CV-756-A, 2015 WL 7681262, at *8 (N.D. Tex. Nov. 5, 2015) (citing Administrative Message 13066 attached as an exhibit to the opinion).

March 21, 2013, which was also signed by Dr. Diggs.[15]  In addition to medication therapy prescribed by Dr. Diggs, the claimant was to engage in individual mental health therapy with Ms. Milson.  That same day, Dr. Diggs adjusted the claimant's medications.[16]

The claimant saw Ms. Milson for counseling on December 5, 2012[17] and on January 4, 2013.[18]  On January 23, 2013,[19] she again saw Dr. Diggs, who noted that she was no longer working, had had a death in the family, was logical and goal oriented, and was continuing with medication management and cognitive therapy. He again adjusted her medication.  He discontinued Zoloft, Buspar, and Vistaril, and Trazodone and started her on Paxil and Benadryl.

When Dr. Diggs saw the claimant again on February 28, 2013,[20] he noted that she continued to be sad and angry and stated that her memory was impaired.  She reported that she was not getting enough sleep, denied suicidal and homicidal

---

[15]     Rec. Doc. 7-1 at 247, 265-266.

[16]     Rec. Doc. 7-1 at 251.

[17]     Rec. Doc. 7-1 at 249.

[18]     Rec. Doc. 7-1 at 248.

[19]     Rec. Doc. 7-1 at 247.

[20]     Rec. Doc. 7-1 at 246.

ideation, but admitted anger and irritability. Dr. Diggs added Nexium and Wellbutrin to her medications.

The claimant was evaluated by clinical psychologist Sandra B. Durdin, Ph.D., at the request of Disability Determination Services on April 10, 2013.[21] Dr. Durdin's evaluation of the claimant occurred before the alleged onset date of the claimant's disability, and Dr. Durdin had reviewed the Independent Behavioral Health Assessment completed at the claimant's initial visit to the Tyler Center on August 27, 2012 but no other records related to the services provided to the claimant by the professionals at the Tyler Center. More importantly, Dr. Durdin's findings were not referenced in the ALJ's decision. Accordingly, Dr. Durdin's findings are of no value and will not be discussed further in this memorandum ruling.

The claimant returned to Dr. Diggs on April 12, 2013.[22] She denied suicidal and homicidal ideation but reported some depressive symptoms, hearing voices, and being suspicious. He diagnosed Lexapro and Wellbutrin.

On June 11, 2013, the claimant saw Ms. Milson for psychotherapy.[23] The claimant reported that she felt some responsibility for her aunt's death, stating that she heard a voice telling her she did not do all she could, although she could not

---

[21]     Rec. Doc. 7-1 at 223-225.

[22]     Rec. Doc. 7-1 at 245.

[23]     Rec. Doc. 7-1 at 244.

articulate what more she might have done to help extend her aunt's life. She reported being shocked by a nephew's recent accidental death. She also reported that she was no longer trying to interact with her family. She reported bad headaches, she denied suicidal and homicidal ideation, and she reported taking her medication as prescribed. She was reportedly trying to increase her level of functioning by going out and doing more things.

The claimant followed up with Dr. Diggs on August 7, 2013.[24] She reported continued gastrointestinal problems, stated that she was sleeping OK and her appetite was fair, but her energy level was poor, she was easily fatigued, her concentration was fair, and she rated her depression at 7 and her anxiety at 10. She denied hopelessness, helplessness, or worthlessness; she denied suicidal and homicidal ideation; and she denied hallucinations and delusions. She reported worrying about money and about putting her home in her name. Dr. Diggs increased her Lexapro dosage and continued her Wellbutrin and Benadryl.

The claimant saw Ms. Milson again on September 20, 2013.[25] She was seeking employment options and reported improvements in her relationship with her family members.

---

[24]     Rec. Doc. 7-1 at 243.

[25]     Rec. Doc. 7-1 at 242.

On December 2, 2013, the claimant again saw Dr. Diggs.[26] She reported depression; sleep problems; decreased fatigue; poor concentration; impaired memory; feelings of hopelessness, worthlessness, or helplessness; and panic symptoms associated with severe depression. She reported that she was unable to find work and unable to complete a certification that would allow her to work in the future. She complained of headaches, and she complained that antihistamines make her drowsy. She also complained that she was unable to afford her medications and unable to get help through Medicaid or the Affordable Care Act. Her medications were continued.

The claimant again met with Ms. Milson on January 6, 2014, February 4, 2014, March 5, 2014, and April 30, 2014.[27] She continued to complain of depression, anxiety, and negative thoughts. She was continuing to explore options for employment in the face of financial difficulties and dependence on her mother.

On June 13, 2014, the claimant was seen by Dr. Karen Bates in the internal medicine clinic at University Hospital & Clinics ("UHC") in Lafayette, Louisiana,[28] in follow up with regard to hypertension, cough, and chest congestion. She was

---

[26]    Rec. Doc. 7-1 at 241.

[27]    Rec. Doc. 7-1 at 239-240.

[28]    Rec. Doc. 7-1 at 293-309.

diagnosed with hypertension and allergic rhinitis. She was prescribed hydrochlorothiazide-lisinopril, cetirizine, and propranolol.

She saw Dr. Diggs again on August 4, 2014, and he adjusted her medications.[29]

The claimant returned to see Ms. Milson on January 16, 2015[30] after not having seen her since November 2014. Ms. Milson noted that four appointments had been scheduled and cancelled during the interim. The claimant reported increased depression, crying, anxiety, agitation, and decreased appetite. She denied suicidal and homicidal ideation and denied paranoid thinking but she admitted seeing her deceased grandmother from time to time. She reported being upset because family members wanted her to relinquish family-owned property. She was taking medications but stated that she found the Wellbutrin and Lexapro to be less effective than before. She agreed to monthly counseling.

The claimant also saw Dr. Diggs again on that same day.[31] She admitted depression and anger but denied thoughts of suicide or self-harm. She reported that she felt bad about herself daily, slept poorly some nights, had a poor appetite, had poor concentration and energy, and felt hopeless some days. Dr. Diggs noted that

---

[29]     Rec. Doc. 7-1 at 238, 274-275.

[30]     Rec. Doc. 7-1 at 273, 566.

[31]     Rec. Doc. 7-1 at 272.

she had severe depression, diagnosed a major depressive episode, and prescribed Buspar, increased her Trazodone dosage, and continued Lexapro, Wellbutrin, and Benadryl.

On February 16, 2015, the claimant saw Ms. Milson again.[32]  She reported a low energy level, continued depression, increased agitation, and anxiety with diarrhea when she gets extremely upset.  She denied suicidal ideation, homicidal ideation, and hallucinations.  She reported thinking that others are out to harm her and thinking that people are talking about her.  She reported taking her medication as prescribed without side effects.  She agreed to increase her level of activity by walking daily.

The claimant saw Dr. Diggs on April 27, 2015.[33]  He noted that her affect was appropriate, her mood was anxious, dysphoric, irritable, and depressed, and her attitude was cooperative.  She had no thoughts of harm to herself or others.  Her thought content contained delusions, was paranoid and fearful, and expressed helplessness and hopelessness.  Her concentration was fair, and her memory was intact.  He continued her medications, including Wellbutrin, Lexapro, Benadryl, Trazodone, and Buspar.  She reported continued headaches, and she reported becoming upset during interactions with family members, particularly with regard

---

[32]     Rec. Doc. 7-1 at 271, 564-565.

[33]     Rec. Doc. 7-1 at 561-563.

to her living in her deceased aunt's house.  She reported continued panic attacks without agoraphobia and breaking things because of difficulty controlling impulses. She explained that she had missed a recent mental health appointment because she thought that she would be hospitalized if she presented for the appointment.  Dr. Diggs noted that her symptoms were moderate and that there had been no change in their severity from the previous appointment.  Dr. Diggs diagnosed major depressive disorder – recurrent episode – psychotic as well as panic disorder without agoraphobia and impulsive control disorder, unspecified.  Dr. Diggs also noted that she had hypertension and obesity.  She was to return in twelve weeks.

The claimant saw Ms. Milson on May 22, 2015.[34]  She again discussed missing an appointment at the Tyler Center because she was so upset that she feared being hospitalized if she went to the appointment.  She had been upset with family members but the situation was resolved.  She reported limiting her interactions with others and indicated that she spent most of her time alone at home.

On July 30, 2015, the claimant returned to Ms. Milson.[35]  She reported being anxious, suspicious, and fearful that someone would start shooting when she was in a store.

---

[34]     Rec. Doc. 7-1 at 560.

[35]     Rec. Doc. 7-1 at 557.

The claimant again saw Ms. Milson on August 27, 2015.[36] She reported feeling depressed, staying in the dark, crying sometimes, being anxious at times, having problems with her memory, and feeling hopeless at times. She also reported that she was attempting a business administration course through an online college but was having trouble keeping up with assignments and feeling frustrated.

On September 4, 2015, the claimant again saw Dr. Diggs.[37] Her affect was appropriate, her mood was dysphoric, and her attitude was cooperative. She expressed no thoughts of harm to herself or others. The claimant reported increased forgetfulness, depression, trouble sleeping, daytime drowsiness, anger, irritability, crying, and lethargy. Dr. Diggs noted that her symptoms were markedly severe and minimally worse. Although Dr. Diggs noted that the claimant's thought content was non-psychotic, his diagnosis of major depression disorder – recurrent episode – psychotic plus panic disorder without agoraphobia and impulsive control disorder – unspecified remained the same. He modified her medication by discontinuing Lexapro, Buspar, and Trazodone, adding Brintellix, and decreasing the dosage of her Wellbutrin and Benadryl. She was to return in twelve weeks.

---

[36]     Rec. Doc. 7-1 at 556.

[37]     Rec. Doc. 7-1 at 54-555.

The claimant again saw Ms. Milson on October 8, 2015.[38] She reported that changes in her medication had helped her symptoms. However, she also reported ongoing problems with depression, anxiety, hearing voices, and impulse control. She admitted getting angry and throwing things as well as having problems interacting with others. She reported that she preferred interacting with elderly people because she found them less judgmental of her. She was continuing to attend school online.

In an Annual Psychosocial Update dated November 12, 2015,[39] Ms. Milson noted that the claimant had chronic depression and anxiety, occupational problems, economic problems, and psychosocial problems that were being addressed with medication management, individual therapy, and psychiatric assessment. She noted that the claimant was not currently psychotic.

The claimant saw Ms. Milson again on December 28, 2015.[40] The claimant denied suicidal ideation, homicidal ideation, and hallucinations. She reported continued anger but stated that her medications helped her maintain control. She reported continued financial problems and recent weight loss. Ms. Milson noted that

---

[38]    Rec. Doc. 7-1 at 553.

[39]    Rec. Doc. 7-1 at 551-552.

[40]    Rec. Doc. 7-1 at 550.

the claimant "follows through minimally with suggested techniques to help her better manage her emotions."

The claimant returned to Ms. Milson on February 5, 2016.[41] The claimant reported medical problems including a change in blood pressure medication that resulted in dizziness and upset stomach. She reported worrying a lot and not managing her depression and anxiety effectively. She also reported sleep disturbance but denied thoughts of harm to herself or others.

On April 20, 2016, the claimant saw licensed clinical social worker Jennifer Bell at the Tyler Center.[42] The claimant was alert and oriented but had a depressed affect. She reported grieving an aunt who had passed away two months previously. Her application for Social Security benefits was causing stress and anxiety. She reported disliking social gatherings, difficulty dealing with stressors, and difficulty engaging in healthful activities.

The claimant saw Ms. Bell again on May 19, 2016.[43] She was still grieving her aunt, and she reported periodic panic attacks and isolation. It was noted that her depression is a severe and persistent mental illness.

---

[41]    Rec. Doc. 7-1 at 548.

[42]    Rec. Doc. 7-1 at 546-547.

[43]    Rec. Doc. 7-1 at 542-545.

The claimant again saw Ms. Bell on August 1, 2016.[44]  The claimant reported auditory hallucinations in the nature of someone calling her name, but she denied having visual hallucinations or thoughts of harming herself or others.  She was still having panic attacks and impulsivity was still an issue, although her anger problems had improved.

On December 14, 2016, Dr. Diggs filled out a Mental Functional Capacity Assessment, in which he estimated that the claimant had a GAF score of 50, signifying serious symptoms.  He noted that she had limitations that were likely to occur more than 50% of the work week in nine categories, including the ability to remember detailed instructions; the ability to maintain attention and concentration for two-hour blocks of time; the ability to perform activities within a schedule, maintain regular attendance, and be punctual; the ability to work in coordination with or in proximity to others without being distracted; the ability to make work-related decisions; the ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to

---

[44]        Rec. Doc. 7-1 at 540-541.

get along with coworkers or peers without distracting them; and the ability to respond appropriately to changes in a work setting.

On December 15, 2016, the claimant testified at a hearing regarding her symptoms and her medical treatment. She explained that she is depressed and spends her time along in the dark crying. She stated that she experiences "horrible" panic attacks about twice a week. She further explained that she had previously worked as a home health aide for her Aunt Mildred, who died in December 2012. She stated that her aunt's death negatively affected her mental state and led her to seek mental health treatment. She admitted having anger control issues. She stated that her depression symptoms are particularly severe about two days out of seven. Although she completed the twelfth grade, she had trouble learning in school and was twenty years old when she graduated from high school. She explained that she failed a cosmetology course and also twice failed online courses through the University of Phoenix. She stated that her mother had helped with her medications and with her finances for the past four years. She stated that she had lost two more aunts in the previous year, which had negatively impacted her mental state. She explained that she had difficulty focusing and concentrating. She said that there are days when she does not get dressed or attend to personal hygiene.

The claimant's mother Vergie Willis also testified at the hearing. She stated that she visits the claimant every day to assure that she takes her medication, to

monitor her eating, and to assure that she gets to her doctor's appointments. She

stated that the claimant has no friends, and sometimes is very quiet, spending time

in her bedroom in the dark, and crying a lot while at other times, the claimant is very

angry and emotional. She testified that, in her opinion, the claimant is incapable of

taking care of herself on her own and requires assistance with being pushed to take

care of her hygiene, keeping herself occupied, and taking care of her finances.

The claimant now seeks reversal of the Commissioner's adverse ruling.

## Analysis

### A.     Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited

to determining whether substantial evidence supports the decision and whether the

proper legal standards were used in evaluating the evidence.[45] "Substantial evidence

is more than a scintilla, less than a preponderance, and is such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion."[46] Substantial

evidence "must do more than create a suspicion of the existence of the fact to be

---

[45]     *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[46]     *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[47]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[48]   In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[49]   Conflicts in the evidence[50] and credibility assessments[51] are for the Commissioner to resolve, not the courts.   Courts consider four elements of proof in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[52]

---

[47]    *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[48]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[49]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[50]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[51]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[52]    *Wren v. Sullivan*, 925 F.2d at 126.

## B.    Entitlement to Benefits

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence,[53] while individuals who meet certain income and resource requirements, have filed an application for benefits, and are determined to be disabled are eligible to receive Supplemental Security Income ("SSI") benefits.[54]

A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[55]  A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such

---

[53]    See 42 U.S.C. § 423(a).

[54]    42 U.S.C. § 1382(a)(1) & (2).

[55]    42 U.S.C. § 1382c(a)(3)(A).

work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[56]

## C.    <u>Evaluation Process and Burden of Proof</u>

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled.   This process requires the ALJ to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[57]

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[58] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[59]   The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[60]

---

[56]      42 U.S.C. § 1382c(a)(3)(B).

[57]      20 C.F.R. § 404.1520.

[58]      20 C.F.R. § 404.1520(a)(4).

[59]      20 C.F.R. § 404.1545(a)(1).

[60]      20 C.F.R. § 404.1520(e).

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[61]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[62]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[63]  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."[64]

## D.    The ALJ's Findings and Conclusions

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since June 7, 2014.[65]  This finding is supported by substantial evidence in the record.

---

[61]    *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[62]    *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[63]    *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[64]    *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

[65]    Rec. Doc. 7-1 at 26.

At step two, the ALJ found that the claimant has the following severe impairments:  depression and anxiety.[66]  This finding is supported by substantial evidence in the record.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[67]  The claimant does not challenge this finding.

The ALJ found that the claimant has the residual functional capacity to perform a full range of work at all exertional levels, with the following limitations: only occasional interaction with the public or coworkers; only simple, routine, and repetitive tasks with one to two step instructions; a work environment free of any fast-paced production requirements; and few if any workplace changes.[68]  The claimant challenges this finding.

At step four, the ALJ found that the claimant is not capable of performing any past relevant work.[69]  The claimant does not challenge this finding.

---

[66]     Rec. Doc. 7-1 at 26.

[67]     Rec. Doc. 7-1 at 27.

[68]     Rec. Doc. 7-1 at 28.

[69]     Rec. Doc. 7-1 at 32.

At step five, the ALJ found that the claimant was not disabled from June 7, 2014 through January 3, 2017 (the date of the decision) because there are jobs in the national economy that she can perform.[70] The claimant challenges this finding.

## E.     The Allegations of Error

The claimant listed three assignments of error, all of which pertain to the ALJ's evaluation of the medical source statement submitted by the claimant's treating psychiatrist, Dr. George Diggs. First, the claimant alleged that the ALJ erred in failing to apply controlling law and regulations in evaluating Dr. Diggs's opinions. Second, the claimant alleged that the ALJ erred in failing to evaluate Dr. Diggs's opinions as those of a treating source. Third, the claimant alleged that the ALJ erred in concluding that Dr. Diggs's opinions do not preclude her ability to consistently perform unskilled work. These allegations of error are so interrelated that they will be considered together.

## F.     Did the ALJ Err in Evaluating Dr. Diggs's Opinions?

Ordinarily, a treating physician's opinion should be given great or even controlling weight if it is: (1) well-supported by medically acceptable clinical and laboratory diagnostics techniques; and (2) not inconsistent with other substantial

---

[70]     Rec. Doc. 7-1 at 33-34.

evidence.[71]  However, a treating physician's opinions are not conclusive.[72]  The ALJ may assign little or no weight to the opinion of any physician for good cause.[73]  Good cause exists where statements are "brief and conclusory, not supported by medically acceptable clinical laboratory diagnostics techniques, or otherwise unsupported by evidence."[74]

In his ruling, the ALJ claimed that "[a]n unknown psychologist whose signature is illegible" had opined that the claimant had a GAF score of 50 and would likely have limitations in several functional categories for more than fifty percent of the work week,[75] referencing the Mental Functional Capacity Assessment dated December 14, 2016 and signed by Dr. Diggs, the claimant's treating psychiatrist.[76] The ALJ further found that these opinions did not, standing alone, preclude work, and he assigned these opinions "partial weight"[77] when he was evaluating the claimant's residual functional capacity.  This was error.

---

[71]     *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *Thomas v. Astrue*, 277 Fed. App'x 350, 353 (5th Cir. 2008).

[72]     *Perez v. Barnhart*, 415 F.3d at 466.

[73]     *Newton v. Apfel*, 209 F.3d at 455-56.

[74]     *Perez v. Barnhart*, 415 F.3d at 466.

[75]     Rec. Doc. 7-1 at 31.

[76]     Rec. Doc. 7-1 at 567-568.

[77]     Rec. Doc. 7-1 at 31.

The ALJ's failure to recognize that the Mental Functional Capacity Assessment was prepared by and expressed the opinions of Dr. Diggs, the plaintiff's treating psychiatrist, shows that the ALJ failed to properly apply controlling law in evaluating Dr. Diggs's opinions. Admittedly, the signature on the assessment is difficult to read. However, Dr. Digg's handwriting and his signature are distinctive. Dr. Diggs's signature on the assessment form matches his signature on at least six other documents in the record: a progress note dated January 16, 2015,[78] a progress note dated August 4, 2014,[79] another progress note from August 4, 2014,[80] a progress note from January 23, 2013,[81] a treatment plan dated September 21, 2012,[82] and an undated prescription page that sets forth Dr. Diggs's diagnosis of the claimant with major depressive episode with psychosis and panic disorder.[83] It is difficult to comprehend that a person reviewing the record would not have become familiar with Dr. Diggs's unique handwriting and signature since some of his treatment notes are handwritten. Furthermore, the claimant's counsel and the ALJ discussed the

---

[78]     Rec. Doc. 7-1 at 272.

[79]     Rec. Doc. 7-1 at 238.

[80]     Rec. Doc. 7-1 at 274.

[81]     Rec. Doc. 7-1 at 247.

[82]     Rec. Doc. 7-1 at 400.

[83]     Rec. Doc. 7-1 at 401.

admission of Dr. Diggs's Mental Functional Capacity Assessment at the hearing. The hearing transcript shows that a Mental Functional Capacity Assessment signed by Dr. Diggs was entered into the record at the hearing and assigned a particular evidence number that was expressly mentioned by the ALJ.[84] Near the end of the hearing, the claimant's counsel referred to the limitations set forth by Dr. Diggs in the Mental Functional Capacity Assessment, expressly referring to Dr. Diggs by name and also expressly referring to the exhibit number that was assigned to the assessment when it was entered into the record at the hearing.[85] Therefore, the ALJ's characterization of the Mental Functional Capacity Assessment as having been signed by "an unknown psychologist" calls into question the care with which the record was reviewed. Even a cursory familiarity with Dr. Diggs's handwriting would reveal that the assessment form was signed by Dr. Diggs and that he did not identify himself on the assessment form as a "psychologist" but as a psychiatrist. The record also establishes that Dr. Diggs is a medical doctor and a psychiatrist rather than a psychologist. The ALJ's failure to recognize that the author of the assessment was Dr. Diggs demonstrates that the ALJ also did not recognize that the Mental Functional Capacity Assessment was prepared by the claimant's treating psychiatrist. Because the ALJ did not properly attribute the assessment to Dr. Diggs,

---

[84]    Rec. Doc. 7-1 at 40-41.

[85]    Rec. Doc. 7-1 at 59.

the ALJ did not properly apply controlling law in evaluating the opinions set forth in the assessment.

Controlling weight is assigned to the opinion of a treating physician if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record.[86] While determining the ultimate issue of disability status is reserved to the ALJ, the ALJ is required to consider all medical opinions in making that determination.[87] Because the determination of disability always remains the province of the ALJ, the ALJ can decrease the weight assigned to a treating physician's opinion for good cause, which includes disregarding statements that are brief and conclusory, unsupported by acceptable diagnostic techniques, or otherwise unsupported by the evidence.[88] Furthermore, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist" – which is the case here – "an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set

---

[86]    20 C.F.R. § 404.1527(c)(2); *Martinez v. Chater*, 64 F.3d at 176); *Bowman v. Heckler*, 706 F.2d 564, 568 (5th Cir. 1983).

[87]    20 C.F.R. § 404.1527(b), (d).

[88]    *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995); *Greenspan v. Shalala*, 38 F.3d at 237.

forth in 20 C.F.R. § 404.1527."[89]    Under the statutory analysis, the ALJ must evaluate the following factors: (1) examining relationship; (2) treatment relationship, including the length, nature, and extent of the treatment relationship, as well as the frequency of the examinations; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that tend to support or contradict the opinion.[90]

Here, the opinions set forth by Dr. Diggs on the assessment form were brief in that he checked off the boxes that, in his opinion, were consistent with the claimant's level of impairment.  But his opinions on the assessment form were well supported by other evidence in the record and there are no contradictory opinions from another treating physician in the record.  Dr. Diggs treated the claimant for more than four years, seeing her on numerous occasions during that time span.  Dr. Diggs originally diagnosed the claimant with major depressive episode with psychosis, panic without agoraphobia, and impulse control disorder, and he repeated this or similar diagnoses over the years.  In September 2013, Dr. Diggs described the claimant has having symptoms associated with *severe* depression.  In September 2015, he noted that her symptoms had worsened and were *markedly* severe.  This was after the point in time when the claimant herself felt that her symptoms were so severe that if she had presented for a scheduled appointment at the Tyler Mental

---

[89]     *Newton v. Apfel*, 209 F.3d at 453 (emphasis in original).

[90]     C.F.R. §§ 404.1527(c).

Health Center, she would likely have been hospitalized for intensive treatment. At times, Dr. Diggs noted that the claimant experienced delusions, visual hallucinations, and auditory hallucinations. He also noted, at various times, that she displayed a depressed and anxious mood;[91] sad affect;[92] anxious, dysphoric, irritable, and depressed mood;[93] dysphoric mood and marked severity of symptoms.[94] Thus, his opinions set forth on the assessment form were supported by his own observations and analysis of the claimant's behavior. The treatment notes of the social workers who provided mental health counseling to the claimant during the same time period that she was seeing Dr. Diggs are not inconsistent with Dr. Diggs's observations and analysis. Accordingly, this Court finds that Dr. Diggs's opinions concerning the extent of the functional impairment resulting from the claimant's mental health conditions are well supported by the evidence in the record, particularly, the treatment notes of Dr. Diggs and the mental health counselors at the Tyler Center.

There is no evidence in the record that the claimant was treated by any psychiatrist other than Dr. Diggs from 2012 forward. Thus, there is no evidence

---

[91]     Rec. Doc. 7-1 at 263.

[92]     Rec. Doc. 7-1 at 241.

[93]     Rec. Doc. 7-1 at 562.

[94]     Rec. Doc. 7-1 at 554-555.

from another psychiatrist contradicting Dr. Diggs's opinions. Although Dr. Julia Doolin found that the claimant is not disabled, there is no evidence in the record that Dr. Doolin ever examined the claimant or that Dr. Doolin is a psychiatrist. Indeed, the initials "Ph.D." following Dr. Doolin's name indicate that she is a psychologist not a psychiatrist. For those reasons, Dr. Diggs's opinions should have been given greater weight than those of Dr. Doolin. Although the ALJ stated that he was giving Dr. Doolin's opinions only partial weight, hers were the only health care provider's opinions referenced by the ALJ in the portion of the ruling having to do with whether the claimant's impairments met or equally listed an impairment. This was error. The ALJ should have considered the opinions of Dr. Diggs, the treating psychiatrist, in making that evaluation, including the functional impairments he noted in the assessment, his diagnosis of the claimant with psychosis, and his descriptions of the claimant's paranoia. The ALJ's ruling does not indicate, however, that any of Dr. Diggs's opinions were considered in determining whether the claimant's impairments met or equaled a listing.

Dr. Diggs's opinions and objective observations were considered by the ALJ in evaluating the claimant's residual functional capacity ("RFC") but given only "partial weight." In making the RFC determination, the ALJ gave partial weight to the opinions of Dr. Diggs (without acknowledging that the opinions were those of the claimant's treating psychiatrist), gave partial weight to the opinions of Dr.

Doolin, the state agency psychologist who did not examine the claimant, and then found that the claimant's mental health conditions had "significantly improved with medication adjustments since December 2015,"[95] based on the social workers' treatment notes. However, Ms. Milson's and Ms. Bell's treatment notes from that time period do not support the ALJ's conclusion that medication significantly improved the claimant's impairments after December 2015.

On December 28, 2015, Ms. Milson noted that the claimant reported to her that her medicine helped her maintain control of herself but she was continuing to experience anger and the social worker's plan was to help the claimant better manage her emotions. There is no indication that significant improvement had been achieved. The treatment note from February 5, 2016 does not mention any improvement in symptoms due to medication. However, it does note that the claimant reported that she was taking her medications as prescribed but continued to have problems coping with increased stress and was not managing her depression and anxiety. The treatment note from April 20, 2016 indicated that the claimant's mood was even with medicine but also reflected the claimant's report of ongoing symptoms of anxiety and depression, and the social worker observed that the claimant's affect was depressed. There is no indication of a significant improvement

---

[95]     Rec. Doc. 7-1 at 32.

in symptomology. On May 19, 2016, Ms. Bell noted that the claimant was reportedly taking her medications as prescribed and doing OK but still having symptoms of anxiety and depression. She also noted that the claimant had severe and persistent mental illness including depression, social withdrawal, and unexpected, sudden, debilitating panic symptoms. There is no indication in the treatment note of any significant improvement in the claimant's condition. On August 1, 2016, Ms. Bell noted that the claimant reported auditory hallucinations, occasional panic attacks, and ongoing impulsivity. Again, there was no indication of a significant improvement in the claimant's condition due to her medication regimen. Therefore, the evidence cited by the ALJ as supporting the conclusion that the claimant had improved "significantly" with medication after December 2015 actually does not support that conclusion. Furthermore, any opinions set forth in the treatment notes of a social worker should not have been afforded more weight than the opinions of a treating psychiatrist.

Dr. Diggs opined that the claimant would be unable to perform various tasks more than fifty percent of the work week due to her mental impairments, including but not limited to not being able to complete a normal work day and work week without interruptions from psychologically based symptoms and not being able to perform at a consistent pace without an unreasonable number and length of rest periods. This Court interprets this to mean that the claimant would be unable to

consistently perform unskilled work and unable to persist over a forty-hour work week. At the hearing, the ALJ asked the vocational expert if a person whose mental impairments made her unable to sustain the concentration, persistence, or pace necessary to perform simple routine tasks on a regular and continuing basis for eight hours a day, five days a week would be able to maintain competitive employment.[96] The vocational expert replied that there would be no jobs if that were the case.[97] The claimant's counsel then stated that the question posed by the ALJ encompassed the limitations set forth by Dr. Diggs in his assessment.[98] Consistent with that testimony, this Court finds that Dr. Diggs's opinions regarding the functional limitations created by the claimant's mental health conditions would, if credited, support a conclusion that the claimant was disabled.

As the opinions of the claimant's treating psychiatrist, Dr. Diggs's opinions should have been afforded controlling weight – or at least more weight than the opinions of the social workers or the non-examining psychologist – since they are supported by Dr. Digg's observation and evaluation of the claimant over a four-year time period and since Dr. Diggs is a specialist in the field of psychiatry. This Court therefore finds that the ALJ erred in weighing and evaluating Dr. Diggs's opinions,

---

[96]      Rec. Doc. 7-1 at 58.

[97]      Rec. Doc. 7-1 at 58.

[98]      Rec. Doc. 7-1 at 59.

that the ALJ's RFC finding was not supported by substantial evidence or reached by applying the proper legal standards, and that the ALJ's ultimate finding that the claimant was not disabled during the relevant time period was neither supported by substantial evidence nor reached by applying the proper legal standards. Accordingly, this matter must be remanded for a proper weighing of the medical opinion evidence.

### Conclusion and Recommendation

For the reasons set forth above, this Court orders that the Commissioner's decision is REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to properly weigh the opinions of the claimant's treating psychiatrist. The claimant shall be permitted to supplement the record with updated medical evidence and to have another hearing if desired. Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act ("EAJA").[99]

Signed in Lafayette, Louisiana, this 10th day of January 2019.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[99] See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).